P. D. KELLETT, JR., Trustee *v.* JOHN K. SUMNER, VICTORIA ELLIS BUFFANDEAU, WILLIAM S. ELLIS, JOHN S. ELLIS, GULSTAN F. ROPERT, and S. M. DAMON, S. E. DAMON and H. E. WAITY, partners under the name of Bishop & Company.

APPEAL FROM CIRCUIT JUDGE, FIRST CIRCUIT.

SUBMITTED MARCH 5, 1903.        DECIDED JUNE 25, 1903.

FREAR, C.J., GALBRAITH AND PERRY, JJ.

A trust cannot be terminated by the consent of interested parties unless all consent, including possible beneficiaries not yet in being or *sui juris*.

"Nearest blood relatives" are not the same as heirs and do not include a wife.

In the absence of exceptional circumstances, a voluntary deed of trust containing no power of revocation, reserving a life interest in the grantor, and with remainders to relatives, is irrevocable.

But under the exceptional circumstances of this case the deed is held to be revocable—it having been executed by a weak-minded and easily influenced aged man, for his own convenience, as he supposed, and in consequence of pressure brought to bear upon him by his relatives, and there being evidence tending to show that the trustee and other beneficiaries as well as the grantor considered it revocable.

A decree will not be reversed for want of a necessary party upon a mere possibility that such party was not represented, when there is reason to believe that it was fully represented, and when the question was raised for the first time on appeal.

The burden is on the trustee seeking to recover a portion of an alleged trust fund to see that all necessary parties are brought in and to show that the sum claimed is subject to the trust.

A trustee of an active trust may sue for the recovery of trust funds without making the *cestuis que trust* parties when his relations with them are not involved.

In suits by trustees, claimants of very remote and uncertain interests under the trust need not be made parties.

A bequest to each of three for the life of the survivor, with a bequest over to the survivor or survivors in case one or two should die before the testator without leaving lawful issue or wife or husband then surviving, and a further gift over in any event on the death of the survivor of the first three, gives nothing to the issue, wife or husband by implication.

## OPINION OF THE COURT BY FREAR, C.J.

### (Perry, J., dissenting.)

This is in form a bill for the discharge of a trustee and the appointment of a successor in the trust, but the substantial issue is between certain of the defendants as to whether the trust has terminated or not. The suit was begun by the Rt. Rev. Gulstan F. Ropert, Bishop of Panopolis, as trustee under a deed executed by the defendant Sumner, but during the hearing, the Bishop being, as was supposed, on his dying bed, the Circuit Judge, with the consent of all parties and upon the agreement that the Bishop's account, showing a balance of $48,025, was correct, made a decree, accepting the Bishop's resignation and discharging him from the trust, and a further decree appointing P. D. Kellett, Jr., in his place, and expressly authorizing the latter to go on with the suit as if he were the original plaintiff, though no formal amendment appears to have been made substituting him as the party plaintiff. The Judge ordered also, with the consent of all the parties, that

the amount above mentioned, which was then on deposit with the defendants, Bishop & Co., bankers, be paid into court, which was done. The defendant Sumner contended that the trust was terminated and that he was entitled to the $48,025, in which contention he was supported by his sister Maria S. Davis, who originally was a defendant but whose name was during the progress of the case stricken from the record, and her son, Wally Davis, who was a defendant to the original bill, but whose name was omitted from the amended bill, and opposed by his nephews, the defendants, the three Ellises, including Mrs. Buffandeau (nee Ellis). Besides the prayers in the bill for the acceptance of the trustee's resignation, his discharge, the appointment of a successor and the payment of the money to such successor, there were prayers for other and further relief generally and "for such other and further disposition of the sum of $48,025 as to the court may seem just and equitable," and John K. Sumner in his answer prayed not only for the discharge of the trustee, but that the trust deed be cancelled and declared no longer in force, and that the sum in question be declared his absolute property and that it be ordered paid over to him. The Circuit Judge finally decreed that the deed be and was cancelled and annulled and the trust terminated, that the money be paid to Sumner, that the new trustee, Kellett, convey to him all property not already disposed of under the trust, and deliver to him all documents, &c., and thereupon be discharged as trustee.

The circumstances were, briefly, these: On February 7, 1895, Sumner made a lease, afterwards assigned to the Oahu Railway and Land Company, of certain land, bordering on Honolulu harbor, for 99 years at an annual rental of $5,500, at the same time giving in the lease an option to purchase the land at any time during the term of the lease for $100,000. A small portion of the land was reserved for 25 years. Sumner was supposed to have title to only one-half of the land, and his title to that was disputed by the government. On February 19, 1895, Maria S. Davis filed a suit, as next friend of

Sumner, who was absent at his home in Tahiti, to set aside
a power of attorney given by Sumner to one Crandall, and to
have a receiver appointed to take charge of his, Sumner's, prop-
erty in these islands, alleging that he, Sumner, was failing
in mind and unable intelligently to transact business. The
Circuit Judge granted the relief sought, but, upon the return
of Sumner from Tahiti, the Supreme Court granted a writ
of prohibition to stay further proceedings in the receivership
matter. Meanwhile, November 13, 1897, Mrs. Davis brought
proceedings to have Sumner put under guardianship as an
insane person, which was done. Pending the appeal from the
order of guardianship, Mrs. Davis brought another suit, as
next friend of Sumner, for the cancellation of certain con-
veyances made by Sumner after the discharge of the receiver.
The conveyances were set aside as having been obtained with-
out consideration and by fraud and undue influence. Also
pending the appeal in the guardianship matter, Sumner exe-
cuted the trust deed in question, on the understanding, as
alleged in the answer of the Ellises (including Mrs. Buffan-
deau) that the Supreme Court would thereupon with the con-
sent of all enter a *pro forma* decree vacating the decree of the
Circuit Judge declaring him, Sumner, *non compos mentis,*
Sumner then being, as also alleged in said answer, "greatly
harassed, annoyed and distressed by the several suits and pro-
ceedings hereinbefore referred to and being advanced in years
and greatly broken by bodily infirmities and desiring to end his
remaining years in peace and without strife and friction with
those who were bound to him by ties of blood and to avoid the
humiliation, mortification and anguish of having the said order
declaring him to be an insane person affirmed by the Supreme
Court." Thereafter the Supreme Court entered a decree set-
ting forth a written stipulation to the effect that the petitioner,
Mrs. Davis, did not desire to press the proceedings further
and that she consented that the decree appealed from be vacated
and the matter discontinued, and decreeing accordingly, but
without prejudice to any one not a party thereto. Whether

the fact that the trust deed had been executed by Sumner was brought to the attention of the court does not appear. The court apparently vacated the decree below on the theory that the parties, particularly the petitioner, desired to discontinue and that was done without prejudice to others not parties. In July, 1902, the Oahu Railway and Land Company decided to exercise its option to purchase the leased property for $100,000, and brought suit to compel a conveyance after a demand for the same had been refused, whereupon, on September 4, 1902, Mrs. Davis again instituted proceedings to have a guardian appointed over Sumner as an insane person, and also, as next friend of Sumner, a suit to cancel the lease and option. On September 24, 1902, the Circuit Judge dismissed the last mentioned suit on the ground that Sumner was sane, and on October 13, 1902, the Circuit Judge, on motion of the petitioner, Mrs. Davis, dismissed the petition for the appointment of a guardian and decreed Sumner to be sane. On the same day the Bishop, as trustee, and Sumner, Mrs. Davis, her son Wally, the two Ellises, Mrs. Buffandeau and her husband, executed a deed of the leased property, and also of the reserved portion, to the Oahu Railway and Land Company for $110,000, and on the next day the railway company discontinued its suit for specific performance. Of this sum, $10,000 was divided among the attorneys of the various parties other than the Bishop, without regard to whether they had served Sumner or his foes, $10,000 was paid to the Bishop for the Roman Catholic Church, and $10,000 to each of the Ellises (including Mrs. Buffandeau) and Mrs. Davis, and $1,000 to one Cathcart for certain alleged services, leaving the sum of $975 unaccounted for in the present case, and the balance now in dispute, $48,025, in the hands of the Bishop, who a few days later, October 21, paid it over to Sumner, who in turn deposited it in the bank of the defendants Bishop and Company, by whom, as stated above, it was paid into court. At the same time the Bishop returned to Sumner a will which was referred to in the deed; and Sumner at once cancelled this and afterwards

burned it. The deed itself was retained by the Bishop to await the preparation of some other document by Sumner's attorney cancelling the deed, &c. The following day the Ellises notified the bankers not to pay out the money to anyone other than the Bishop, and five days later this suit was instituted.

The foregoing is a bare outline. It is unnecessary to go at length into the details as they appear in the voluminous evidence or as may be read between the lines, this latter being the part to which counsel particularly addressed themselves in their oral arguments, if not in their briefs.

The question is whether the trust has terminated, and it will therefore be necessary to set forth the relevant parts of the deed and will creating the trust. The deed (from Sumner to the Bishop and his successors in office) describes Sumner as "a resident of Tahiti, at present temporarily in Honolulu" and recites: "Whereas, the party of the first part desiring that his property and interests in the Hawaiian Islands shall be in charge of some competent and disinterested person, and the party of the second part has kindly agreed to accept the trust and confidence in him hereinafter expressed." The conveyance is expressed to be "in consideration of the premises and in order to effectuate such desire and agreement", and is in trust "to collect all the rents and profits thereof and to pay thereout all taxes and other expenses incurred in respect of managing or attending to the same, together with any expenses incurred by the party of the second part for legal advice or services concerning the same or the management thereof, and to pay the balance thereof from time to time as received by the party of the second part to the party of the first part during his lifetime, and at his death to grant and convey said property and pay any of such unapplied income to such uses and purposes and to such persons as the party of the first part shall by his last Will and Testament, made and executed on the 17th day of September, A. D. 1898, name and appoint, and in default of such appointment, to such persons as shall by

the law of Hawaii be entitled in cases of persons dying intestate;

"And in further trust and with power hereby expressly granted to the Trustee to make such leases and agreements of lease of the said property or any part or parcel thereof, upon such terms and conditions and for such rentals as the Trustee shall think proper, and to collect and give receipts for the rentals, and to collect all moneys now or hereafter due, payable and coming to the party of the first part within the Hawaiian Islands and to apply the same as above directed in respect of the income of said property.

"And also, in trust and with power hereby expressly granted to the Trustee to adjust, compromise and settle all claims of every description now or hereafter made against the party of the first part, in such manner as the Trustee shall think fit and to bring such actions and proceedings in law or equity in respect of said property or any part thereof, or of any other rights or claims of the party of the first part, and to conduct the same to final judgment and execution or adjust, compromise and settle the same as the Trustee shall think fit;

"And in all respects to conduct and manage the said property and the matters hereinabove mentioned as fully and effectually to all intents and purposes as the party of the first part could do." The trustee accepted the trust.

The will, referred to in the deed as executed the same day, was destroyed, as stated above, but its contents were proved in part as follows: In substance one-fourth of all the property, except the life interest, to the Bishop for the use of the church and the support of Saint Louis College, and then "All the rest, residue and remainder of my property, I give, devise and bequeath to the Bishop of the Roman Catholic Church in Honolulu, in trust to manage the said property and collect the income from the same, and pay the income thereof in equal moieties to William Sumner Ellis, John Sumner Ellis and Victoria Sumner Ellis, the children of my dear niece, Nancy Sumner Ellis, deceased, during their lives and the life of the

survivor of them; but if any of them become bankrupt or insolvent, the trustee shall during the life of each beneficiary apply the annual income in and to the maintenance, clothing, lodging and support of any of them, or of the wife or children of any of them as the trustee shall, at his discretion, think proper. In case at my death my said grand-nephews and grand-niece shall have died without leaving lawful issue or wife or husband then surviving, the shares taken under this will shall descend to and become the property of the survivors, and upon the death of the survivors of the said children of Nancy Sumner Ellis, the property shall revert and become the property in fee simple of the nearest blood relative of John K. Sumner living at the time of the death of the survivors of them, or in case of more than one relative of the same degree of relationship to them in equal moieties, in order that the property may remain in the Sumner family for all time."

The property and the proceeds thereof now in question were part of the property covered by these items of the will.

Several contentions are made to show that the trust has terminated. The suggestion is made that by the terms of the trust deed itself this money should be paid to Sumner, for all the income is to be paid to him during his life and the deed provides further that the trustee is "to collect all moneys now or hereafter due, payable, and coming to the party of the first part within the Hawaiian Islands and to apply the same as above directed in respect of the income." In view of our conclusion on another point, no opinion need be expressed upon this.

Another contention, much urged, is that the trust could be terminated by consent of all parties interested and was in fact so terminated when the $110,000 was distributed as above set forth. The proposition of law that the trust may be terminated by the consent of all interested seems to be conceded, but it is contended that such consent was not given in this case. Whether the Ellises, the Davises and the Bishop so consented in fact, we need not inquire at this point, nor need we say whether the

Ellises could so consent as matter of law in view of the insolvency clause in the will. It is clear that by the terms of the trust, as set forth in the latter part of the will, Sumner's nearest blood relatives living at an uncertain future time had contingent interests and they are yet undetermined, and so cannot consent. They may be children of Sumner, yet unborn. In order to justify a termination of the trust by consent, all interested must consent. *Brandenburg v. Thorndike,* 139 Mass. 102; *Cartwright v. Cartwright,* 10 Haw. 403; Perry, Trusts, Secs. 104, 920. But, it is argued that such nearest blood relatives are only heirs of Sumner and that when a devise is made to heirs, the latter take by descent and not by devise, and hence that this is merely a case of a reversion to Sumner, and that therefore the consent of such relatives is not required. A sufficient answer to this is that "nearest blood relatives" are not the same as heirs. They are not the same as next of kin according to the statute of distributions nor the same as relatives. Even "nearest relatives" would not, much less would "nearest blood relatives," include a wife,—who would be included under our statute among "heirs." *Haraden v. Larrabee,* 113 Mass. 430; Hawkins, Wills, 97, 104; Underhill, Wills, Secs. 590, 591.

A third contention, which in our opinion is sound, is that the trust was revocable by Sumner under the circumstances without the consent of the other beneficiaries.

The Ellises contend that the trust could not be terminated either by the consent of all interested who are now in being and *sui juris* or by Sumner himself, although they were ready enough to participate in its spoliation to the extent of $62,000. If the trust is not terminable, they and all others who have shared in the trust fund should be required to restore it. No one has offered to do this, and it is doubtful how much of the $62,000 could be obtained on execution in case the trust should be held irrevocable, even if judgment should be obtained by the new trustee against the several participants. How far, in case the trust were irrevocable, the trustee or his representa-

tives would be liable for the $62,000 paid out in technical, though unintentional, breach of the trust, we need not say. Whether any of the sums distributed could be recovered by Sumner as having been obtained by fraud or undue influence, in case the trust is held revocable, we need not say. It doubtless would have been much better for Sumner, considering his infirmities and the activity and avarice of his relatives, if the trust could have been kept intact, for he would then have been assured a good income for the rest of his life, but, now that the greater portion of the fund is gone, and the rest would soon go to others under the trust, it may be a question whether it would be better for him to keep the balance tied up, giving him the income only, or to let him have it and get what enjoyment he can from what he is not cheated out of during the brief remainder of his life. While this is the greater portion of his property, he apparently has sufficient in Tahiti to maintain himself. But the court cannot continue or terminate the trust merely according to what may seem to be for his best interests, if under the circumstances he has a right to revoke it.

Courts have swayed somewhat from time to time and differed from each other in their opinions as to when a trust of this nature is revocable by the grantor. At times the view seems to have been taken that the mere omission of a clause of revocation or the mere neglect of counsel to call the attention of the grantor to the advisability of inserting such a clause, is sufficient to show mistake or undue influence and justify revocation, or will at least cast the burden on any one seeking to sustain the trust to prove that it was made deliberately and intelligently with an intention that it should be irrevocable. But the better view at the present time seems to be that those are only circumstances to be taken into consideration with other circumstances and that the real question is whether the grantor intelligently and freely created the trust with the intention that it should not be revocable. Instructive series of cases upon this subject are found in England and Pennsylvania, the present view being set forth in the recent cases of *Hall v.*

*Hall,* L. R. 8 Ch. App. 430, (overruling L. R. 14 Eq. Cas. 365) and *Kraft v. Neuffer,* 202 Pa. St. 558. The following are other cases of this general character in those jurisdictions. *Frederick's Appeal,* 52 Pa. St. 338; *Russell's Appeal,* 75 Pa. St. 269; *Rick's Appeal,* 105 Pa. St. 528; *Bristor v. Tasker,* 135 Pa. St. 110; *Reidy v. Small,* 154 Pa. St. 505; *Chestnut St. Nat. Bank v. Fid. Ins. Co.,* 186 Pa. St. 333; *Wilson v. Anderson,* 186 Pa. St. 531; *Prideaux v. Lonsdale,* 1 De G., J., & Sm. 433; *Toker v. Toker,* 3 De G., J., & Sm. 487; *Coutts v. Acworth,* L. R. 8 Eq. Cas. 558; *Wallaston v. Tribe,* L. R. 9 Eq. Cas. 44; *Everitt v. Everitt,* L. R. 10 Eq. Cas. 405; *James v. Couchman,* L. R. 29 Ch. Div. 212. See also *Ewing v. Wilson,* 132 Ind. 223; *Garnsley v. Mundy,* 24 N. J. Eq. 243; *Aylsworth v. Whitcomb,* 12 R. I. 298; Underhill, Trusts, 102.

If one intelligently and freely creates a trust of this character, although without consideration and although he is to retain the benefit himself for life, he cannot as a rule revoke it as against remaindermen. But under special circumstances, as shown by the cases above cited, such a trust is revocable, and in our opinion, such special circumstances exist in this case. Indeed, this would seem to be a particularly strong case as compared with many of the cases cited above.

We need not consider whether the deed, by referring to a will already made, though on the same day, makes it a part of itself, so as to prevent a defeat of the trust by a revocation of will afterwards; or whether the deed itself can be revoked on the theory that, though in form a deed, it was really merely testamentary in character; or whether the failure of the trust to the extent of more than half the trust fund and the grantor's deprivation of corresponding expected benefits, through undue influence or otherwise, might affect the question; or how far the trust was improvident in locking up for the rest of his life the greater part of the grantor's property or in not leaving the way open to the grantor to make provision for the to him unforeseen and unsuggested contingency of his marrying again and having children; nor need we consider whether the evi-

dence or the pleadings would permit a cancellation of the deed on the ground of insanity, fraud or undue influence at its inception.

It is undisputed that no clause of revocation was inserted, and there is no evidence that the advisability of inserting such a clause was called to Sumner's attention in any way. These are generally regarded as important facts in connection with other facts in cases of this kind. In some instances such facts are shown by the very nature of the trust itself to be comparatively immaterial, as where the trust is created for the express purpose of protecting the grantor from his own intemperate and spendthrift habits, or where a woman in contemplation of marriage puts her property in trust for the express purpose of preventing her husband from getting control of it, for in such cases if the trust were revocable, its purposes could be defeated at any time, in the one case by the desires of the intemperate man or spendthrift overcoming him and in the other by the husband's influence on the wife, and hence in such cases there is good ground to believe that the trust is intended to be irrevocable, at least so long as the reasons for it continue. But, where, as here, the creation of the trust is purely voluntary, without consideration, and for the grantor's especial convenience and by a weak-minded aged man acting under much pressure, the case is different.

If anything is clear in this case, it is that Sumner has never conceded for a moment that he was incompetent to manage his own property, although he acknowledges certain infirmities, such as defectiveness of eyesight and partial loss of memory, and even that he needs advice at times. If there is one thing that he has dreaded, it has been the imputation of insanity. No one has so much as suggested that he is intemperate or a spendthrift. It was not his thought in executing the deed to protect himself from himself, or to provide for his relatives. His need of protection because of mental weakness may have weighed strongly with his sister and his attorneys at the time

as a justification for urging or advising him to execute the deed, but he apparently took a different view of the situation.

If we look to the deed itself, we find in it much that, especially to a man like Sumner, aged and infirm and unfamiliar with law, would indicate that it was of a temporary nature and for his own convenience. It describes him as a resident of Tahiti, temporarily here; it recites that he desires his property and interests here to be in charge of some competent person and that the Bishop had kindly consented to act, and that the deed was made to effectuate such desire; it then proceeds, in declaring the trusts, to enumerate powers found in ordinary powers of attorney, ending with the provision that the trustee is "to conduct and manage the said property and the matters hereinabove mentioned as fully and effectually to all intents and purposes as the party of the first part could do." It reserves to him the entire income for life, and then directs that the property shall go after his death to such persons as he *shall* by his will made the same day appoint, and *in default of such appointment,* to his heirs. It does not appear whether the will was made before, at the same time as, or after the deed, though we presume it was part of the same transaction, but, especially if the deed and will were parts of the same transaction, why were not all the trusts inserted in the deed, if they were intended to be irrevocable? A man like Sumner would naturally suppose the will to be revocable, and the language of the deed also would seem to indicate that to a man like him. Further, the trustee was given no power to sell, and no power to invest the proceeds although the option for the purchase of the property had already been given. It was not at all unlikely that the option would be exercised at any time and the property covered by the deed of trust converted into money. If it were contemplated that the trust was irrevocable, it would seem that ordinary prudence would have called for the insertion of a provision in regard to the investment of the proceeds of the sale. If the deed was executed for the grantor's own con-

venience, this goes far towards furnishing sufficient ground, as shown by the cases, for holding that it is revocable.

If we look outside of the deed, there is little direct light, so far as the circumstances at the time of its execution are concerned. But inferences may be made. If, as suggested by counsel for the Ellises, Sumner was then, as found by the Circuit Judge at the time, *non compos mentis,* and has not since been restored sufficiently to ratify the deed, it ough: not to stand in any event. If, as the Ellises allege in their answer, Sumner executed the deed because he was harassed, annoyed and distressed by the litigation in which his relatives were involving him, and in order to end the strife and friction with them, and avoid the humiliation, mortification and anguish of having the decree that he was insane affirmed by the Supreme Court, in other words, if, as the argument seems to be, he was forced or blackmailed into executing the deed for the purpose of tying up his property for his relatives, this also is one of the strongest reasons, as shown by the cases, for holding the deed revocable. There is no doubt that Sumner was greatly annoyed by that litigation and that he deeply felt the humiliation of being declared insane. He was then 76 or 78 years old and at least somewhat weak-minded and easily influenced, and, considering the state of his mind in view of the litigation and the actions and conduct of his relatives, it looks very much as if he was practically forced into executing the deed, and these circumstances afford strong additional ground for holding the deed revocable.

The evidence shows further, so far as it shows anything upon this point, that Sumner himself never regarded the deed as irrevocable. His actions have throughout harmonized with the theory that he believed it revocable. And there is much reason to believe that all the others directly interested, as well as their attorneys at the time of the distribution, thought so too. The Bishop, the trustee, apparently thought so. He not only paid out the greater portion of the trust fund to others on Sumner's orders but he paid the balance of the money to Sum-

ner and delivered the will to be canceled and was ready to cancel the deed, until others interfered. He also accepted $10,-000 from the trust fund as a voluntary gift from Sumner for the Church, although he would have been entitled, for the Church and Saint Louis College, in a few years, to one-fourth of the whole property under the trust. His conversations with Sumner and his attorney, when he paid over the money, and with the Ellises when he tried to induce them to be satisfied with $10,000 apiece as gifts from Sumner, and the testimony of Father Valentine all go to show that he believed the trust was at an end. No appeal is taken by the trustee. Apparently the suit was brought by the Bishop out of abundant caution to get a judicial determination in view of the fact that the Ellises had questioned the termination of the trust. The six attorneys who represented the various parties at the time of the distribution were of the same opinion, or else they were guilty of deliberately joining in the spoliation of the trust for a share of the booty. The Davises were of that opinion, as they say themselves, and they received $10,000 of the fund, besides $5,000 for their attorneys. And, lastly, the Ellises themselves were of the same opinion, however strenuously they may now deny it. The negotiations for the final settlement, resulting in the discontinuance of the suits, the execution of the deed to the Oahu Railway and Land Company, and the distribution of the $110,000, were somewhat protracted. It was known all along by the Ellises that Sumner needed or desired and expected a considerable sum, at least $15,000, to take back to Tahiti for the purposes of his business there. The first proposition was to allow Mr. Sumner $15,000 out of the then expected $105,-000, the attorneys $5,000, the Church $10,000 and the Ellises the remaining $75,000, the last named sum to be placed in the hands of a trustee to pay the income to the Ellises during Sumner's life and then divide the principal among the three Ellises, giving them $25,000 each. This scheme fell through because of the objection of the Ellises' attorneys that the trustee was not required to give a bond and that his compensaton was too

great. After that Sumner seems to have steadfastly refused to give more than $10,000 apiece out of the expected money. This proposition seems to have been delayed for sometime in its execution through the stubbornness of William Ellis in insisting on having $15,000. But at last he yielded. The Ellises therefore received $10,000 each, besides what was paid to their attorneys, thus not only participating in but urgently insisting on a breach or revocation of the trust, as to the greater part of the trust fund, and then, although well knowing Sumner's need and expectation of money for his interests in Tahiti, set up the claim that he could not have a cent but that the entire balance must be kept intact mostly for themselves. Actions speak louder than words, especially subsequent words, although prior words are not altogether wanting here to the same effect as the actions. It is remarkable, we may observe in passing, that, notwithstanding the large interests involved, the length and heat of the negotiations and the number and ability of counsel, there is so little direct evidence as to the exact understanding on the final distribution of the fund. Unfortunately, owing to the Bishop's illness, his testimony could not be obtained, the attorneys in general seem to have been studiously silent, the two Ellis boys were out of the Territory during the hearing, and the testimony of those who did testify is meager upon what was actually said in the negotiations. But it is clear what Sumner's intention was, and what all the relatives, including the Ellises, knew it was, and what they led him to believe, and that they all knew that he gave them the several sums on the strength of that belief, and that was, that upon payment of those sums, he would be rid of them forever so far as the balance of the fund was concerned.

The Ellises contend, among other things, that they are in a different position from that of the Davises, because the latter signed an express release of all further claim to Sumner's property, when they received the $15,000 paid to them for themselves and their attorneys, while they, the Ellises, did not sign any such release. From this it is argued that whatever

may have been the understanding of the Davises, they, the Ellises, did not intend to relinquish any right to the balance of the trust fund. But this release of the Davises was prepared at the Ellises' request by their own attorneys and its execution was procured by those attorneys, and, so far as appears, Sumner knew nothing about it until afterwards. The Davises apparently signed it on the supposition that the Ellises were to execute similar releases, and Sumner apparently proceeded on the theory that no releases were needed from any of the parties. It may be that the Ellises did intend not to release any claim to the balance of the fund, but, if so, they kept that intention well concealed until they had procured the release by the Davises and had got into their hands as much of the fund as they could for the time being.

Another thing relied on to show that the Ellises did not intend to release their claims to the $48,025 is that at the last meeting, when the deal was consummated, Mrs. Buffandeau's husband asked Sumner what he was going to do with the rest of the money and that he replied that the Bishop was still his trustee and that they would get the rest of it when he died, and that thereupon one of their attorneys jumped up and said, "that is all we want to know, children, sign the deed" (meaning the deed to the Oahu Railway and Land Company). It is not altogether clear just what was said then. The two Buffandeaus testified as above. The attorney testified that the question and answer by Buffandeau and Sumner were as above, but was silent as to whether he, the attorney, said anything. Mr. Cathcart testified that Sumner replied "Oh, the Bishop is still trustee." Sumner testified that he replied, "It is none of your business; that is my business." One thing, however, does appear, that Sumner, then from 82 to 84 years of age, with all his infirmities and burdened with his trials, was there wrestling practically alone with his relentless relatives and their attorneys, and that when he was asked the question by Buffandeau, he became angry and apparently made whatever reply he did made, in desperation. Mrs. Buffandeau herself testified that

they knew Sumner wanted to take back to Tahiti fifteen to twenty thousand dollars. Mr. Buffandeau himself testified that he asked Sumner the question out of curiosity and good naturedly. The question, moreover, implied that Sumner could do as he pleased with the money. If it was still subject to the trust, why ask what Sumner was intending to do with it? The attorney could hardly have advised as he is said to have done on the theory that that answer of Sumner's was to settle the question whether the balance of the money was to remain subject to the trust as matter of law. He could have so advised, if he did, only on the theory that Sumner was to continue the trust as a matter of his own intention at that time. It is surprising indeed that the Ellises are compelled to place so much reliance upon such a scrap of evidence as this from among all that was said and done during weeks of active negotiations—a mere off-hand reply of an aged man, in desperation to a question of idle curiosity asked by the husband of one of the parties. It remains that the Ellises thought the trust sufficiently revocable to justify their acceptance of $35,000 of the fund, knowing that Sumner expected by yielding to that extent to their importunities to be free as to the rest so far as they were concerned. This, indeed, migh operate as an estoppel so far as the Ellises are concerned.

Under circumstances like these, courts hold that trusts of this nature may be revoked. It is unnecessary to say how far the case should be classed under any one head of equity jurisdiction—such as mistake, fraud or undue influence. It looks very much as if it presented a compound of these and perhaps other ingredients, though, perhaps, not all in equal parts.

It is further contended that the decree cannot be affirmed in any event because of the want of necessary parties, to wit, the wives and children of the Ellises and the Saint Louis College. These, it is contended, are beneficiaries, with either vested or contingent interests, under the trust, and as such are necessary parties. This argument is based on the theory that the will must be given effect as a part of the deed even if it should

never take effect as a will, for there can be no interest under it as a will until the death of the testator. Let us assume that to be the case. The point, as to parties, is not raised by the pleadings and apparently was not suggested in the court below. It is, moreover, purely technical, for these interests, if they existed, were, so far as appears, fully represented in fact by others who were parties, namely, the interests of the wives and children by their husbands and fathers who were parties and who contested the case as vigorously as they could, and the Saint Louis College by the Bishop, who, there is reason to belive, was the legal representative and had full control of the College, and who was not only plaintiff as trustee for all but was defendant as legatee trustee for the College. So far as the College is concerned little need be said in addition to what has already been said. It does not appear just what the exact language of the will was in regard to the College, nor does it appear that the College was not fully represented. Even if the Bishop did not sufficiently represent it as trustee for all or as trustee devisee or legatee for the College, still there is reason to suppose that the Bishop was the only one who could represent it as ultimate *cestui que trust*. Under the circumstances the decree below should not be reversed on the bare possibility that some one else might in law be entitled to appear for it.

Now, as to the wives and children. There are, perhaps, a number of reasons why the decree should not be reversed, at least *in toto,* because these persons were not made parties. Several of these reasons will be stated. In the first place, conceding that the bill has technically some objects for which all persons interested should be made parties or at least be represented, yet most of these other matters were settled by decrees not now appealed from and are not in dispute and have turned out to be of a somewhat incidental nature. The gist of the suit was whether Sumner should be required to pay the money back to the trustee. The suit was brought by the trustee, not by Sumner. The latter had the money. The obligation was on the trustee and others contending the same way not only to see

that all necessary parties were joined but to show that it was Sumner's duty to pay over the money. If they failed in those respects, the money naturally remains with Sumner. Consequently, so far at least as the money is concerned, there is no reason for reversing the decree appealed from. But there would be nothing, on this view, to prevent further proceedings by the wives and children to subject the money again to the trust. They would not be concluded. Secondly, it is contended that, so far at least as the money is concerned, the trustee as plaintiff could maintain the suit against Sumner without joining any others—even the Ellises themselves. For, in a suit whether by or against the trustee of an active trust, to recover a portion of an alleged trust fund the relations between the trustee and the beneficiaries may not be involved. In such case the trustee represents all the *cestuis que trust,* and a decree for or against the former binds the latter in the absence of fraud or collusion. See *Kerrison v. Stewart,* 93 U. S. 159; *Manson v. Duncanson,* 166 U. S. 533; *Stevens v. Bosch,* 54 N. J. Eq. 59; *Clemens v. Heckscher,* 185 Pa. St. 476; *Belding Sav. Bank v. Moore,* 118 Mich. 150; *Cheatham v. Rowland,* 92 N. C. 340. But there is much to indicate that under the circumstances of this case the relations between the trustee and beneficiaries were involved and so we do not rely on this point. Under this theory also it might be contended with some force that there are other matters covered by the decree, aside from the right to the money, in respect of which the trustee did not sufficiently represent the beneficiaries. Thirdly, are not the interests, if there are any, of the wives and children, too uncertain and remote to require them to be made parties? The only clause, if any, under which they could claim in the deed, apart from the will, is that which directs the trustee to convey the property, on the death of the grantor and in default of appointment in the will, to those entitled by Hawaiian law in cases of persons dying intestate. But this is altogether too uncertain. Besides the uncertainty as to default of appointment, there is the uncertainty as to who will be the heirs.

They cannot be ascertained until the death of the testator. In the will itself there are four clauses that may be considered. It is clear, for the reason just mentioned in connection with the deed, that the interest, if any, under the last clause of the will, which directs that the property be ultimately conveyed to Sumner's nearest blood relative or relatives would be too remote and uncertain. Such would be the case also under the first clause relating to the Ellises, which directs that the income be paid to them severally for the life of the survivor, for in that case the wives and children, if they would take at all during the life of the survivor or survivors after the death of one or two, would take by descent from the husband or father and not by purchase under the deed or will. So under the clause relating to bankruptcy or insolvency, they would take no interest whatever. The trustee is not required by that clause to pay anything to the wives or children. He is merely given discretion in case of the bankruptcy or insolvency of any one of the Ellises to apply the income to the support of any of them or of the wife or children of any of them. See *Booraem v. Wells,* 19 N. J. Eq. 87. The only remaining clause is that which directs that in case at the death of the testator the three Ellises (probably meaning one or two of them) shall have died without leaving lawful issue or wife or husband then surviving, the shares, &c., shall go the survivors, &c. This is the clause that was at first relied on, the argument being that the wives and children were given estates by implication, but the chief reliance now seems to be upon the bankruptcy clause which we have just disposed of. If any interest is given by this clause, it is a contingent interest only and that, too, one depending on several contingencies—contingencies not only of the uncertain collateral event of the Ellises dying before the testator but of the uncertainty as to the existence or ascertainment of what persons, if any, will take. Will there be any such wives or children at the time in question. If wives, will they be the ones now living ? If children, who will be the survivors ? We assume that there are such wives and children at the present time.

Are not these interests, if any, too remote and uncertain? See *Temple v. Scott,* 143 Ill. 290. But, lastly, in our opinion, the wives and children did not under this clause take any interests however uncertain. If they took an interest at all, it was by implication. Estates by implication are not favored. If the will is regarded as part of the deed for the purposes of construction as well as for the purpose of creating interests before the death of the testator, it cannot, of course, be construed as giving an estate by implication under the clause in question. But let us look at it as a will for the purposes of construction in this respect. Courts go much further in stretching the language of a will than of a deed in order to give effect to the intention. It is well settled that a devise or bequest to A indefinitely or in fee with a gift over in the event of A's dying without leaving children surviving, gives nothing to the children. The same is true if the prior gift is to A for life only. In the first case the whole estate is given to A and he has the means of providing for his children. In the second case, there would seem to be much reason to suppose that the children, if any, were intended to take after A, but that is not a necessary implication, and so courts take the view that the children are merely mentioned as part of the description of the condition on which the gift over is to take effect, and that speculation as to the intention of the testator cannot be indulged in to such an extent as to give the children an estate. *Si voluit, non dixit.* 1 Jarm, Wills, 563; 1 Underhill, Wills, Sec. 468; *Scale v. Rawlins,* (1892) App. Cas. 342; 45 Ch. Div. 299; *Greene v. Ward,* 1 Russ. 262. The same is held also when, as here, the alleged gift by implication would be not by way of remainder but by way of substitution, that is, when the contemplated death of the first taker is in the testator's lifetime. *Cooper v. Pitcher,* 4 Hare 485; *Lee v. Busk,* 2 D. M. & G. 810. It is true that, so strong is the implication in favor of the children when the prior estate is limited for life, courts in such cases sometimes seize upon comparatively slight indications in other parts of the will to hold that the children were intended to take. But

here, aside from the fact that each prior estate is not for the life of the taker but for the life of the survivor of three takers, the only other clause of the will which throws light on the intention of the testator as to the wives and children weakens the view that they were intended to take by implication. That is the bankruptcy clause. That, so far as it goes, shows merely that the Ellises themselves were intended to provide for their wives and children, and that, even if they failed to do that, the wives and children were to be provided for by the trustee in his discretion and not by giving the wives and children an estate. Moreover, that clause was to apply only in the event of the Ellises surviving the testator while the clause in question was to apply only in the event of their not surviving the testator. Again, that clause relates to wives and children while this relates to wives, husband and lawful issue. Further, what estate, if any, is given to the husband, wife or issue by implication? Is it an estate for the life of the survivor of the Ellises? That is all it could be in view of other provisions of the will, but if there is any estate by implication from this clause taken by itself it is either an estate for their own respective lives or an absolute estate. And in what proportions or how would a wife or husband and several children take? Would a wife and several children of one of the Ellises take equally as tenants in common for the life of the surviving Ellis? And, again, if all the Ellises should die before the testator (as the first part of this provision taken literally and by itself seems to contemplate), it is clear that the wives, husband or children could not take at all, even though there would be as much reason for providing for them in that event as in the event of only one or two of the Ellises dying before the testator. There is much room for speculation as to what the testator intended. This is increased by the fact that the will is carelessly drawn and does not clearly express the real intention in several respects. No doubt there is much reason to believe that the testator meant that the wives, husband and children should be provided for in some way in the event named, but that is not a necessary im-

plication. Still less is it a necessary inference that he meant to give them definite estates. If he did mean that, he did not say it. And on the authorities we must hold that they took nothing. The present tendency seems to be to limit rather than extend the doctrine of estates by implication.

The appeals are dismissed, the decree appealed from affirmed, and the case is remanded to the Circuit Judge for such further proceedings as may be proper consistent with this opinion.

*T. McCants Stewart* for the Trustee.

*J. A. Magoon, J. Lightfoot* and *Geo. A. Davis* for Sumner.

*Humphreys, Thompson & Watson* for the Ellises and Mrs. Buffandeau.

### DISSENTING OPINION OF PERRY, J.

It may be assumed for the purposes of this case that a deed of trust irrevocable by the grantor alone may nevertheless be revoked by him if all of the beneficiaries consent and also that the evidence shows that the three Ellises, Maria S. Davis, W. Davis and the Bishop on behalf of the Catholic Church and St. Louis College consented that this deed be revoked and the trust terminated. Still from such consent an effective revocation did not result for the Ellises, the Davises and the two institutions named were not the only possible beneficiaries under the deed. The provisions of the will made September 17, 1898, became, by the express terms of the deed, a part of the deed and this, too, whether the will was made before or after or concurrently with the execution of the deed. It is well settled that if a deed refers to a will for a statement of some of its provisions, the parts of the will so referred to thereby become a portion of the deed just as though they had been incorporated in the same instrument and thereupon take effect, not as a will, but as a part of the deed, that the Ellises, the Davises and the Bishop are not the only possible beneficiaries under the terms of the trust as set forth in the will is made clear in the majority opinion; I concur in the views there expressed on that subject.

The only question remaining is whether or not the deed is revocable by Sumner alone. I say the only question, advisedly, for it seems to me that the question of whether or not the deed should be cancelled or set aside on the ground that it was the act of one incapable of contracting or was executed under mistake or obtained by undue influence or other species of fraud is not before the court for determination. The issue last mentioned is not presented by the pleadings,—on the contrary the parties in their pleadings all proceed on the theory that the deed was validly executed and that the trust thereby created continued until at least some time in the latter part of the year 1902, when, as is claimed in Sumner's answer, a revocation was effected. No averment, either in express words or even by implication, is to be found in any of the pleadings to the effect that the deed was procured by fraud or as a result of misunderstanding or mistake, nor is there any prayer to have the deed, for any such reason, declared null and void and cancelled and set aside. The substance of the averments of Sumner's answer is, admitting the truth of the petitioner's allegation that a deed of trust was executed on September 17, 1898, that such deed was revoked and the trust terminated by reason of certain acts done in or about the month of October, 1902. One averment is that the payments to the Ellises and to Maria S. Davis were made by him *"in contemplation* of the revocation of the said deed of trust and the termination of the right of the said petitioner in and to the said property"; another, that on October 21, 1902, the petitioner delivered over to him (Sumner) the will and certain property "for the purposes of further carrying out the *intention* of the respondent as aforesaid to terminate said trust"; and still another that such delivery and cancellation and certain other named acts of a similar nature were done "by petitioner and respondent" "with the full understanding of the said petitioner that the said trust existing under the said trust deed was to all intents and purposes *then and there* terminated and ended." "Wherefore", (that is, by reason of the averments contained in the answer) Sumner prays, not that the

deed be declared null and void and be set aside, but that the deed may be "cancelled and declared to be *no longer* in force and effect." Not only do the pleadings show that the question is not allowed but at the argument each of the attorneys in the case said, in substance, in answer to a specific question by the court, that it was not claimed that the deed should be set aside on the ground that its execution had been obtained by fraud.

Assuming, however, that the question last discussed is presented by the pleadings, my conclusion is that the evidence utterly fails to show that the deed was obtained by any species of fraud whatever. In the first place, I take it to be clear that for the purposes of this case Sumner must be regarded as having been on September 17, 1898, and ever since and as being now mentally capable of contracting and of executing a deed or will. The decree of the Circuit Judge, made shortly prior to that date, declaring Sumner mentally incapable was, on appeal, vacated by the Supreme Court; and on October 13, 1902, a court of competent jurisdiction, in a direct proceeding, made a decree declaring him sane. None of the parties to this proceeding or their attorneys claim that he was at the time in question mentally incapable but, on the contrary, all of the attorneys claim in argument that he was mentally capable. In the second place, the general rule is that fraud is not to be presumed but must be proved by the party alleging it. There is, it is true, an exception, real or apparent, to this rule, in cases where a benefit has been obtained or an advantage gained by one who stands towards the giver or grantor in a relation of trust and confidence, as, for example, where the relation is that of agent and principal, attorney and client, or guardian and ward. In such cases the law, recognizing the very great advantage possessed, by virtue of the relation and of the resulting confidence, by the agent over the principal, the attorney over the client, and the guardian over the ward, in dealings had between them, and in order the more readily to effect justice, does not permit the party having such advantage to retain the benefits unless the entire fairness of the transaction is proven by him. But the

present case is not one falling within the exception. Maria S. Davis and her son,—to say nothing of the fact that the possibility of benefit to either of them under the deed was extremely remote and improbable—did not stand towards Sumner in any relation of trust or confidence. The evidence shows beyond doubt that for a considerable time next prior to September 17, 1898, they had been engaged in litigation which, while intended for his benefit, was regarded by Sumner as antagonistic to him, such litigation culminating in the attempt to have him placed under guardianship. In September, 1898, Sumner, far from placing any trust or confidence in them, regarded them as hostile to him. There is no evidence whatever tending to show that Sumner reposed any confidence in the Ellises, his grandnephews and grandniece, to any greater extent than a man naturally would in those related to him in that distant degree. The Bishop, too, is not shown to have possessed Sumner's confidence to any such degree as would bring him within the class under consideration, or even that he had prior to that time ever acted for Sumner as his agent or adviser or otherwise in any matter of business. None of the attorneys who acted obtained any benefit under the trust, except, possibly, in being paid their fees, but as to those no complaint has ever been made.

The rule, then, and not the exception, applies in this case. The burden imposed by that rule upon Sumner has not been sustained. None of those who were present and took part in the transaction leading up to the signing of the deed or will give any testimony as to what was said or done at that time. The only attempt to introduce such testimony was made by the attorney for the Ellises, but the testimony was excluded, *on Sumner's objection,* on the ground that the witnesses were his, Sumner's, attorneys at the time and that the communications then had between them were privileged. This privilege, if it existed at all, was, it must be remembered, Sumner's and not his attorneys', and it was entirely competent for him to have waived it if light was indeed desired on the transaction. Having shut out this testimony, the *best* evidence obtainable on the

subject, Sumner cannot now be heard to complain that the Ellises did not prove in detail the circumstances attending the preparation and execution of the instruments and the entire fairness of the transaction. The subject of mistake will be referred to with more particularity on another branch of the case.

Is the deed revocable by Sumner alone? And hereunder, first, is it testamentary in character? In my opinion, it is not. "Whether an instrument is a deed or a will depends upon the time when it is to take effect, rather than upon its form or manner of execution. A deed takes effect upon its delivery in the grantor's lifetime. A will takes effect from the death of the testator."—2 Jones, Real Prop. and Conveyancing, 1230. This instrument was intended to take effect upon delivery and to convey at once to the trustee the legal title to the property subject to the trusts specified. The trustee was given active duties to perform and it is necessary that he should have the title in order to carry out the directions of the deed. If the language of the deed means anything at all it means that the grantor placed it beyond his power to make after September 17, 1898, a will of the property covered by the deed. The use of the words "and in default of such appointment" is not an indication to the contrary, for even in the view that they show that the grantor reserved liberty to revoke thereafter the will of that date so as to eliminate its provisions as provisions of the deed, the remainder of the context of the deed shows that the direction to the trustee in the event of such revocation was to convey to those who would be entitled by law in case of intestacy. But I think that the correct construction of the language used (that is, if the will was not made prior to or concurrently with the deed) is that if the will should be actually made on September 17, 1898, its provisions should thereupon become incorporated by express reference as provisions of the deed and no attempted revocation of the will, subsequent to that date, could operate to eliminate those provisions from the deed although it might be operative as a cancellation so far as the disposition of property not covered by the deed is concerned. It is at least

equally clear that if the will was made before or concurrently with the deed, it could not be thereafter revoked so as to effect its provisions as a part of the deed. At whatever hour of the day the will was executed, the provision as to "default of such appointment" may well have been inserted to meet the possible contingency of the will being subsequently declared null and void and set aside by judicial order.

The contention that the nearest blood relatives mentioned in the will are only heirs of Sumner and that when a devise is made to heirs the latter take by descent and not by devise, and hence that this is merely a case of a reversion to Sumner, that the whole equitable title is in Sumner and that therefore he can revoke the deed without the consent of others, is sufficiently disposed of in the majority opinion. In that disposition I concur.

The deed on its face is irrevocable. Much stress is laid upon the fact that the deed recites that Sumner is a "resident of Tahiti, at present temporarily in Honolulu", that "whereas the party of the first part desiring that his property and interests in the Hawaiian Islands shall be in charge of some competent and disinterested person * * * and in order to effectuate such desire and agreement" the grantor doth convey, etc., and that the trustee is authorized "in all respects to conduct and manage the said property and the matters hereinabove mentioned as fully and effectually to all intents and purposes as the party of the first part could do," and it is argued that to a man like Sumner this language would seem to indicate that the deed was revocable and that he would also suppose, naturally, the will to be revocable. So far as the probabilities go, the fact in all probability is that a formal instrument such as this, couched in legal language, would have conveyed to Sumner's mind, if left to him alone to read and study, very little, if any, light as to its meaning, and further that it was not left to him alone to read and study but that the substance and effect of the instrument was explained to him by others of greater intelligence and better versed in those matters. There is no reason

to suppose on the evidence that he was incorrectly advised as to its legal effect. The instrument must be construed as a whole. Its essential, operative parts must be considered as well as the recitals and the general and practically immaterial clause above quoted. So considered the instrument on its face should, in my opinion, be construed and understood as an absolute and irrevocable conveyance.

It is contended, however, that in view of the peculiar and exceptional circumstances of this case, it must be held that at the time of the execution of the deed Sumner understood and intended it to be revocable, that he executed it in its present form by mistake, and that therefore the court must now by decree declare that he has successfully revoked it and that the trust has terminated. The fact that the clause of revocation was omitted is one of the circumstances thus relied upon. Formerly in England and in Pennsylvania and perhaps some other States it was held that the omission of a clause of revocation from a deed such as this was of itself *prima facie* evidence of mistake and of the understanding of the grantor that the deed was revocable and that it was sufficient to throw the burden on the party seeking to sustain the trust to prove that the omission was not by mistake, but this view no longer prevails and it is now generally held that such omission is a mere circumstance which, like any other relevant circumstance, is to be considered and given such weight, one way or the other, as it may be entitled to upon all the evidence. This would seem to be as favorable a rule as those attacking the trust may well expect. The very essence of the inquiry is whether the omission was by mistake or understandingly, and to say that because the clause was omitted that is any evidence tending to show that it was omitted *by mistake* seems to me to be at least a happy method of solving the difficulty. But let it be assumed that the modern rule is good and that the circumstance of the omission may be considered. Still, "the question of the right to revoke a voluntary trust resolves itself into a question of intention, and the proper subject for inquiry in this, as in every

case, is, did the settlor, when he executed the deed, deliberately intend that his settlement should be revocable, or not?"—*Potter v. Trust Co.,* 199 Pa. St. 360, 362.

The deed on its face does not, as I think, contain sufficient evidence of an intention to make it revocable to throw the burden upon those seeking to sustain the trust to show by other evidence that such was not in fact the intention. The circumstances shown by the extrinsic evidence and the inferences derivable from the facts so proved lead me irresistibly to the conclusion that the deed was, at the time of its execution, actually intended to be irrevocable. The motive, too, for the grantor's taking such a course appears. Sumner was an old man, weak-minded and easily influenced. Within at least the four or five years next preceding September, 1898, he had made a number of foolish and improvident business transactions and had been taken advantage of by unscrupulous and designing persons who had secured and for the time being possessed his confidence. Had those transactions been permitted to stand, his property would have been in large part consumed thereby and the rest would soon have followed in a similar way. By various judicial proceedings instituted by her for the purpose, his sister, Maria S. Davis, caused the most important of those transactions to be set aside and the property to be restored to its owner and put an end to the influence of those with whom he had been dealing. While he was capable of being easily influenced to his detriment he was also capable of being persuaded, though at times with much difficulty, of the mistakes he had been led to commit and of the real character of his supposed friends. Finally, in 1898, came the guardianship proceedings and the decree of the Circuit Judge placing him under guardianship. That decree was rendered on June 17, 1898, and Maria S. Davis' consent to its reversal and her discontinuance were given in writing on September 19, 1898, two days after the execution of the deed. From these facts the most natural and the strong inference is that he was advised and influenced, not unduly, but properly and legitimately to make such a deed for

protection from his own weakness and to put an end to the possibility of having his property taken from him by unscrupulous persons. Such advice would have been wise. The execution of the deed was certainly the wisest business transaction the plaintiff ever performed, that is, after he became mentally weak. He was advised in the matter by Messrs. W. R. Castle and P. L. Weaver of the bar, Messrs. W. A. Kinney and S. M. Ballou advised Mrs. Davis and Mr. Alfred S. Hartwell also acted for some one interested, whose name, however, was not disclosed by the testimony, in consequence of an objection by Sumner. Upon the evidence there is not room for even the slightest suspicion that any of these men acted towards Sumner otherwise than with the greatest fairness not only in advising him what to do but in making him fully acquainted with the terms and legal effect of the deed. Sumner was capable of being influenced for good as well as to his detriment and, while it is true that he seemed to abhor above all things being placed under guardianship or being judicially declared mentally incompetent to care for his property, he still was, at times at least, capable of recognizing his own weakness. A sufficient motive for the deed, protection from himself, existed. That he was not a drunkard or a spendthrift does not alter the case. Deeds of trust made by drunkards are sustained by courts, so far as the question of motive is concerned, not because the grantors are habitually intemperate, but because by reason of such habitual intemperance they, like those who are spendhtrifts, waste their property and need protection from their own weakness in that respect. Equity should, and I believe does, lend her aid to sustain voluntary conveyances made to protect the grantor from weakness of the nature of that under which Sumner labored as readily as it does in cases of conveyances made as a protection from weakness of other classes. "Where the intent to make an irrevocable gift is perfectly apparent, or where, even in the absence of such a clear intent, a sufficient motive (such as protection against the grantor's own extrava-

gance, *or the like*) for making such a gift exists, the settlement cannot be disturbed."—Bispham, Equity, pp. 106, 107.

Again, is it natural to suppose that his sister, who had spent the better part of three years in litigation of an extremely disagreeable nature, in the endeavor to save and protect his property and who had obtained the decree (although appealable) of a court of competent jurisdiction placing his property under the control of a guardian, would have yielded all of the advantage so gained by acquiescing in the execution of a deed which Sumner would have the power to revoke at any time, within three months as effectually as after five years? On the contrary, it seems to me that the very strong inference is that she would not have done so and that she gave up the benefit of the judicial proceedings only because by another method equally effective although milder in form the property had been placed beyond the power of Sumner to lose. If it be said that she knew that she could bring new guardianship proceedings at any time if he should revoke the trust, the obvious answer is that that is unreasonable. One who, especially a woman, had just gone through the details of such a contest in court, is not at all likely to abandon results actually obtained for any arrangement of wholly uncertain duration or to consent to renew the contest when that course can be avoided. It is suggested in this connection that the inference is that Maria S. Davis desired and understood the trust to be revocable because it was to her interest that it should be, there being practically no provision in the will for her benefit. But it does not appear that she knew at the time what the contents of the will were and the evidence does show that Sumner was averse, even during the negotiations of 1902, to making known those contents. (Incidentally, this explains why not all the terms of the trust were inserted in the deed itself.) Moreover, I am satisfied from the evidence that, whatever were her motives in the litigation of 1902, Maria S. Davis was, in the proceedings of 1895 to 1898 and in her conduct towards her brother at that time,

not actuated by any selfish motives, but acted solely for what she believed to be his best interests.

The point is made that the Davises, the Ellises, the Bishop and the attorneys, as well as Sumner, all showed by their conduct in the events of 1902 and more particularly by the acceptance of portions of the trust fund, that they understood that the trust was revocable. Assuming that the Ellises so understood the matter in 1902, that throws no light on the question of what *Sumner* understood in 1898, for they are not shown to have taken any part in the transaction leading up to the execution of the deed and their understanding in 1902 must have been based upon hearsay or upon their own construction of the instrument or that of their attorneys if they consulted any. Similarly of the attorneys. They were not present in 1898. Their opinions have value as those of men learned in the law, but not as evidence of the actual occurrences of 1898 or of the belief produced by those occurrences in Sumner's mind. The Bishop, too, is not shown to have been present in 1898. For aught that appears to the contrary, he was merely offered the trust and accepted reluctantly as an accommodation to the old man. Moreover, the evidence shows, as it seems to me, that he concurred in the payments made out of the trust fund because, as he thought, all the beneficiaries were consenting, and delivered the remainder of the trust property to Sumner because of a mistake on his part as to the legal effect of the Circuit Judge's order (in October, 1902,) dismissing the petition for the appointment of a guardian and declaring Sumner sane. When shown by Sumner a newspaper article to the effect that the $50,000 had been left in trust for the Ellis heirs, the Bishop said: "That is not true, because, you know, Mr. Sumner, you have been discharged by the court and now you are a free man and you can do what you like." As to Sumner himself I doubt very much whether in 1902 the thought ever occurred to him that he could revoke the deed without the consent of the beneficiaries until it was suggested to him at the trial by one of his attorneys. The Davises had brought pro-

·ceedings (in 1902) to prevent the execution of the deed demanded by the Oahu Railway & Land Company and the Ellises or some of them had threatened similar proceedings. The Oahu Railway & Land Company wanted the deed signed by all of these parties to secure a title perfect beyond dispute. In order to place himself in a position to execute the conveyance and to secure its execution by the others and also to obtain from them a release of all of their claims under the trust deed or otherwise, and having no thought that there were any other possible beneficiaries, he made the payments out of the proceeds of the sale. Even if, however, Sumner in 1902 did think that the deed was revocable by himself, that fact would be entitled to very little, if any, weight in ascertaining what he thought in 1898 because of his weakness of mind and memory.

The averment in the answer of the Ellises that Sumner, "being greatly harrassed, annoyed and distressed by the several suits and proceedings hereinbefore referred to and being advanced in years and greatly broken by bodily infirmities and ·desiring to end his remaining years in peace and ·without strife and friction with those who were bound to him by ties of blood and to avoid the humiliation, mortification and anguish of having the said order declaring him to be an insane person affirmed by said Supreme Court in which an appeal from said order was then pending" executed the deed, is not, as seems to be contended, the equivalent of an admission that he was forced ·or "blackmailed" into executing the deed for the purpose of tying up his property for his relatives, and is not inconsistent with the claim that the deed was executed freely and under·standingly.

As to improvidence. The deed made practically no provision for any future wife or child of the grantor after the latter's death. Ample provision is made for such wife or issue during Sumner's lifetime in that all of the income is reserved to him for that period. Sumner's wife, Ninito, had died only a few months prior to the execution of the deed. While there was still a possibility of his re-marrying and having issue, there

was very little probability, at his age and under all the circumstances, of either. Such a possibility would very naturally escape the attention of Sumner, of those advising him and of all others concerned. Moreover Sumner had some property in Tahiti which would not be affected by the deed,—in his answer he says that he has "large property interests there located." If the execution of the deed was free from imposition, undue influence and every other species of fraud, mere improvidence would not be a sufficient ground for setting it aside or terminating the trust,—at least not until the contingency, with reference to which alone the conveyance could possibly be deemed improvident, should happen—and would at most be relevant only in so far as it might together with other circumstances tend to throw light on the question of the fairness of the transaction at its inception and of the intention and understanding of the grantor at that time.

The fact that a large portion, more than one-half, of the trust fund has passed out of the control of the trustee at the request or with the consent of Sumner, appeals to me, not as a reason for passing the remainder into Sumner's control, but as strong evidence of the continued existence of the necessity for protection from himself which, as I believe, prompted the creation of the trust in the first instance.

Further discussion of the conduct and motives of the Ellises, the Davises and the attorneys in the transactions of October, 1902, and comments thereon are here omitted because, except as above pointed out, those matters seem to me to be immaterial and irrelevant in a consideration of the issues involved in this case. If the recent payments or any of them were made under mistake or obtained by undue influence or fraud of any other kind, that might be good ground for setting aside those payments but does not tend to show that in September, 1898, there was any mistake, misrepresentation, undue influence or other species of fraud; and if the court finds that the deed has not been successfully revoked and is of the opinion that the trust should not be terminated, it should not order the money paid

over to Sumner in disregard of the terms of the trust even though the conduct of the Ellises has been such as to estop them from claiming that the trust is irrevocable.

As to the authorities, in none of the more recent cases, as I understand them, whether in England or in Pennsylvania or in any other State, is it held that upon facts such as I have found in this case equity will either enforce a revocation by the grantor or itself terminate the trust. If any of them do so hold, I decline, with respect, to follow them. *Rick's Appeal* and *Frederick's Appeal* and other similar decisions have been distinguished and limited in later Pennsylvania cases to such an extent that there is very little, if anything, left of the extreme doctrines there laid down. "Generally the cases in which voluntary settlements have been set aside have been where there have been fraud or imposition in their procurement; where the design had been to give the settlor full enjoyment of his property for life, with power of testamentary disposition, and at the same time to protect it from his creditors; where the instrument was in itself or in connection with other instruments testamentary in character; where the intention to make the instrument revocable clearly appeared; where the purpose of the settlement had failed; or where the trust created was merely a naked one. The rule is that a voluntary settlement will be sustained and enforced in favor of the beneficiaries, unless it is shown that it was procured by fraud or imposition, or executed under misapprehension of the facts or of the law."—*Potter v. Fidelity Ins. Trust & Safe Deposit Co.,* 199 Pa. St. 360, 365 (1901), approved in *Kraft v. Neuffer,* 202 Pa. St. 558, 565 (1902). "Settlements like that before us, reserving a present interest in the creator of them, and carrying a future benefit or bounty to other designated parties, are very usual. If fairly made and carried into effect, uninfluenced by fraud or circumvention, they cannot be subsequently impeached, as is shown, among other determinations, by our own case of *Ruth v. Reese,* 13 Ser. & R. 434."—*Greenfield's Estate,* 14 Pa. St. 489, 501. See, generally, *Wilson v. Anderson,* 186 Pa. St. 531; *Merriman*

*v. Numson,* 134 Pa. St. 114; *Reese v. Ruth,* 13 S. & R. 434; *Toker v. Toker,* 3 De Gex, J. & S. 486; *Hall v. Hall,* L. R. 8 Ch. App. Cases 437; *Reidy v. Small,* 154 Pa. St. 505; *Rynd v. Baker,* 193 Pa. St. 486; *Taylor v. Buttrick,* 165 Mass. 547.

The point is made, but evidently not much relied on, that the proceeds of the land sold to the Oahu Railway & Land Company of which the fund in court is a part, is payable to Sumner under the provision of the deed that the trustee is to "collect all moneys now or hereafter due, payable and coming to the party of the first part within the Hawaiian Islands and to apply the same as above directed in respect of the income of said property." Construing the instrument as a whole, I am of the opinion that that clause was not intended to apply to a transaction such as that in question. The purpose of the deed and the motive for its execution strengthen this view.

In my opinion the deed cannot be revoked by Sumner alone and the court should not now terminate the trust. No sufficient reason is shown why it should be terminated and there is a strong reason why it should be continued. Its purpose has not failed. The weakness against which it was intended to afford protection is certainly not less now than it was at the inception of the trust and is perhaps greater. The prayer of the bill for the appointment of a new trustee should be granted and the fund in court should be paid over to such trustee.